**ATHENS NEWSPAPERS, INC.,**
Plaintiff-Appellant,

v.

**JEFFERSON STANDARD LIFE INSURANCE COMPANY,**
Defendant-Appellee.

No. 83–8209.

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

Frank C. Jones, J. Kevin Buster, Atlanta, Ga., for plaintiff-appellant.

Emmet J. Bondurant, Atlanta, Ga., for defendant-appellee.

Before HILL, VANCE and ANDERSON, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Plaintiff, Athens Newspapers, Inc., (Athens) brought this suit in state court for a declaratory judgment, asserting that certain provisions of a contract it had signed with the defendant, Jefferson Standard Life Insurance Company (Jefferson), are invalid under state law. Jefferson, asserting jurisdiction on the basis of diversity of citizenship, removed the case to federal district court and filed numerous counterclaims. After several years of litigation, Jefferson successfully moved for summary judgment on a counterclaim that is dispositive of the case. The district judge denied Athens' motion under Federal Rule of Civil Procedure 59(e) to alter or amend judgment, and Athens filed this appeal. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

The *Athens Banner-Herald* is a daily newspaper published in Athens, Georgia. In 1965, Billy Morris and his brother Charles became interested in purchasing the *Banner-Herald*. In an effort to obtain funding, they contacted Jefferson, and the Morrises and Jefferson eventually worked out an agreement under which Jefferson would lend the Banner-Herald Publishing Company (Publishing Company) (a corpora-

tion chartered by the Morrises for the purpose) $1.35 million [1] without requiring the Morris brothers personally to guarantee the loan. In return for Jefferson's making the loan without personal guarantees, the Morrises agreed to an "equity kicker"—a rather complex option arrangement designed to allow Jefferson either to acquire an equity interest in the Publishing Company or receive cash above and beyond the repayment of the loan should they so desire. It is this option agreement that creates the basis for dispute in this case. The agreement states:

(1) Stockholders in the Company do hereby grant, give, and convey unto Jefferson Standard Life Insurance Company, hereinafter called "Jefferson Standard," the right, privilege and option to purchase the 1100 authorized but unissued shares of the Common Stock of the Company (or such as shall constitute 40% of the total stock of all classes of the Company outstanding after said purchase) upon the terms and conditions set forth in this agreement. In the event this option to purchase said shares is exercised, the purchase price Jefferson Standard shall pay to the Company shall be $1,000, and in all events after said purchase, Jefferson Standard shall own 40% of the total stock of the Company outstanding after said purchase.

(2) Commencing immediately upon the full payment of the First and Second Mortgage Notes, issued under and secured by an Indenture of Mortgage and Deed of Trust from Banner-Herald Publishing Company to North Carolina National Bank, as Trustee, dated September 1, 1965, or the expiration of twenty (20) years from date thereof, whichever is earlier, the Morrises and Company hereby grant to Jefferson Standard the right and option for a period of two (2) years from said date, to sell and put to the Company its option to purchase herein granted, or to sell and put to the Company the stock which may have been issued pursuant to an exercise of the option,

---

1. This amount represented eighty-nine percent of the purchase price of the *Banner-Herald.*

and Company covenants and agrees to purchase such stock or option so put by Jefferson Standard, and for a price which shall be the then appraised value as hereinafter defined, of the option agreement or of the stock if previously issued, at the date of exercise of the option to sell and put.

(3) If, at the end of said two-year period set forth in paragraph (2), Jefferson Standard has neither sold and put the option to purchase, or sold all stock issued pursuant thereto to the Company, the Company shall have the right and option for a period of one year from the date of expiration of the two-year period set forth in paragraph (2) to purchase and call the stock which may have been issued to Jefferson Standard pursuant to an exercise of its stock option, or to purchase and call the option agreement in favor of Jefferson Standard, at and for a price which shall be the then appraised value of the option agreement or of the stock, if previously issued, as hereinafter defined, at the date of the exercise of the option to purchase and call.

(4) In the event said stock and/or the option to purchase said stock has not been purchased by the Company pursuant to the terms hereof within the time allowed above for the option, put and call, then the option of Jefferson Standard as set forth in paragraph (1) shall continue until exercised, provided that it shall, in any event, expire 25 years from the date hereof.

This section of the purchase and sale agreement essentially provides as follows:

(1) Jefferson would be able to purchase 40% of the shares of the Publishing Company for $1000 for a twenty-five year period (Jefferson's purchase option);

(2) Within a two-year period after the Publishing Company repaid the loan, Jefferson would be able to "put" (sell) its option to purchase the stock to the Publishing Company for cash equal to the appraised value of forty percent of the stock (Jefferson's put option); or

(3) Within the same two-year period, Jefferson could exercise its option to purchase the stock and then resell the stock to the Publishing Company for its appraised value (Jefferson's purchase and put option).

In addition, the Publishing Company would be entitled to purchase Jefferson's option or any stock Jefferson had acquired by exercising that option for a period of one year after the expiration of the two-year period (the reacquisition option).

Shortly after acquiring the newspaper, the Publishing Company encountered financial difficulties; and, in a transaction not directly relevant to the resolution of this case, Southeastern Newspapers (Southeastern) acquired the stock of the Publishing Company after executing a written guarantee of performance of the option set forth above. In 1968, Southeastern merged with Athens Newspapers, Inc., (Athens) with Athens surviving, and Athens assumed Southeastern's obligations under the option agreement. Both parties agree that the district court correctly concluded that these mergers/acquisitions do not affect the resolution of this case except by placing Athens in the position formerly occupied by the Publishing Company.

On December 1, 1976, Athens paid the last installment of the $1.35 million loan; on November 1, 1978, Jefferson notified Athens that it was exercising its put option under the purchase and sale agreement. Athens then filed the present action in state court (subsequently removed to federal court) for a declaratory judgment that the put option is invalid under former Ga. Code Ann. § 22–1828(d), which limits the amount a Georgia corporation can pay for its stock, *see Brooks-Pruitt Tire Co. v. Brooks & Zuker Tire Co.*, 192 Ga. 644, 16 S.E.2d 423 (1941). In its answer, Jefferson denied Athens' assertion that the option is invalid and asserted several counterclaims. In the sixth alternative counterclaim, Jefferson asked the court to enforce its purchase option.

The district court decided to determine the value of the stock before addressing

Athens' claim under the Georgia statute because the valuation determination might well moot the legal issue; therefore, the court ordered the parties to arbitrate pursuant to the agreement to determine the value. (The Fifth Circuit affirmed that order in an unpublished opinion.) The parties unsuccessfully attempted to have the senior judge of the Clark County Superior Court appoint the third[2] arbitrator as called for in the contract; however, he failed to act for over a year. Therefore, in July, 1982, (at which time Athens had not purchased Jefferson's option) Jefferson filed a motion for summary judgment in which it requested the district court to grant its sixth alternative counterclaim and enforce the purchase option. The district court granted the motion over Athens' objections. Athens then filed a motion under Rule 59(e) in which it requested the court to alter its judgment and resurrect Athens' reacquisition option, which, under the terms of the agreement, had expired in 1979. The court denied that motion; and Athens appeals both the granting of the Jefferson's summary judgment motion and the denial of its Rule 59(e) motion.

## II. JEFFERSON'S RIGHT TO EXERCISE THE PURCHASE OPTION

■ Athens argues that when Jefferson attempted to exercise its put option, the option ripened into a contract, extinguishing Jefferson's right to exercise its purchase option. In support of this argument, Athens cites cases holding that an option to purchase land so ripens into a contract when it is exercised. *See Chatham Amusement Co. v. Perry,* 216 Ga. 445, 446, 117 S.E.2d 320, 323 (1960). As the district court noted, Athens has been placed in a rather anomalous situation: it argues that the put option is unenforceable under Georgia law but that Jefferson's attempted exercise of that option ripened it into an unenforceable contract and negated Jeffer-

son's right to exercise the purchase option. We conclude that under the wording of the agreement, Jefferson's purchase option was not extinguished as Athens argues.

The agreement between the parties specifically provides that Jefferson has the right to purchase forty percent of the outstanding stock of Athens for $1,000 "[i]n the event said stock and/or the option to purchase said stock has not been *purchased* by" Athens. Agreement ¶ 4 (emphasis added). It is clear from the agreement that Jefferson's initial election to exercise its put option would extinguish Jefferson's right to buy the stock only at such time as the *purchase* by Athens of the option had been consummated. The agreement uses the term "exercise" in the same paragraph that it uses the word "purchase," *see* ¶ 4; from this, we conclude that the parties intended to distinguish the two terms and reject the argument that the word "purchase" simply represents poor word choice. Since Athens had not purchased the option, Jefferson retained the right to exercise it.

Athens contends that this resolution of the case yields an incredible result when extended to its logical conclusion: suppose Jefferson, after the arbitration and judicial proceedings were completed, had then decided to exercise the purchase option. To allow Jefferson to do this, according to Athens, would result in wasted time and effort, rendering the arbitration proceedings a "mockery." We need not pass on such a situation to resolve this case; however, we note that the result, upon closer examination, is not so anomalous as it first appears. When Jefferson attempted to exercise its put option, Athens contended that the Georgia statute rendered the option unenforceable. The record shows that the lawyer who acted for both parties in preparing the agreement foresaw the possibility that Athens would make such an assertion.[3] By wording the agreement to allow

**2.** Each party selected an arbitrator of its own choosing.

**3.** The attorney wrote to Jefferson shortly before the parties closed the loan and stated:

Section 22–1828(d) of the Georgia Code provides that every Georgia corporation shall have the right "to purchase, hold, sell and transfer shares of its own capital stock; pro-

Jefferson to exercise its purchase option unless its exercise of one of the other options had been consummated, the attorney may well have acted to ensure that the possible invalidity of the other two options would not deprive Jefferson of the benefit of its bargain. If the agreement had been worded as Athens argues the parties intended, Jefferson would have been without a viable means of exercising its "equity kicker" had the put option proved invalid or unenforceable—the possibility forseen by the lawyer. The attempted exercise of the invalid alternative would have prevented Jefferson from exercising an otherwise valid alternative. The record does not show whether the drafter of the agreement in fact forsaw such a chain of events; however, the scenario demonstrates Athens' characterization of our interpretation as incredible to be without merit.

It is possible that any contract, no matter how drafted, might yield bizarre results under some circumstances. The possible invalidity of the put option—and the possibility that Athens would argue it to be invalid—were known to both parties at the time the contract was drafted. Given the legion of bizarre results that could foreseeably occur as a result of the interrelationship between the parties' desires and Ga. Code Ann. § 22–1828(d), it may well be that the provision allowing Jefferson to purchase forty percent of Athens' shares should the purchase not be consummated as contemplated was the best-considered provision in the entire agreement.

### III. THE SIXTH ALTERNATIVE COUNTERCLAIM

Athens argues that Jefferson's sixth alternative counterclaim does not request the

vided that no such corporation shall purchase its own shares of capital stock except from the surplus of its assets over its liabilities, including capital stock, provided further, that shares of its capital stock shall be purchased only from earned surplus where there is outstanding another class of shares having a distribution preference over the shares purchased." These provisions apparently apply to common stock as well as preferred stock.

Apparently, a Georgia corporation may not pay more than "book value" for its stock, excluding the capital stock account. *Brooks-*

relief granted by the district court. The counterclaim states:

> In the event that the Court should rule that the provisions of paragraph 2 of the Athens Newspapers, Inc. Stock Purchase Option (Exhibit G) may not be enforced against Athens, Southeastern or W.S. Morris III as prayed in the First Counterclaim, and denies the relief sought by Jefferson Standard under its First, Second, Third, Fourth and Fifth Alternative Counterclaims, then, in the alternative, Jefferson Standard asserts this Sixth Alternative Counterclaim against Athens Newspapers, Inc., and Southeastern Newspapers Corporation.

1–27.

> Jefferson Standard hereby incorporates by reference the allegations of paragraphs 1 through 27 of its Counterclaim as allegations of paragraphs 1 through 27 of its Sixth Alternative Counterclaim.

28.

> Jefferson Standard is entitled under the provisions of paragraph (1) of the Athens Newspapers, Inc., Stock Purchase Option contract (Exhibit G), as amended (Exhibit M), to specific performance of its option "to purchase 2,267 authorized but unissued shares of the Class A Common Stock of the Company (or such as shall constitute 40% of the total stock of all classes of the Company outstanding after said purchase," upon payment of $1,000.00.

*Pruitt Tire Co. v. Brooks & Zuker Tire Co.*, 192 Ga. 644, 16 S.E.2d 423. Thus, if the appraisal were to show that the fair market value of Jefferson's stock exceeded the earned surplus of the company, it appears that it would, to the extent of the excess, at any rate, be unenforceable. Our final opinion will be that the option is valid and binding on the company, in accordance with its terms, so long as the purchase price does not exceed "the surplus of (the company's assets over its liabilities), including capital stock."

**29.**

Defendants-in-counterclaim Morris III, Athens Newspapers, Inc., and Southeastern have repudiated the obligations of the Stock Purchase Option contract with Jefferson Standard.

**30.**

If, notwithstanding the other consideration rendered by Jefferson Standard to Athens, Morris III and Southeastern, the Court should rule, as contended by plaintiff, that Athens is prohibited from performing the above contract unless it receives a minimum price per share equal to the $10 per share par value of the Class A common stock of Athens stated in its charter, and the Court also refuses to require Athens to amend its charter to delete this provision or to require Southeastern to convey 40% of its stock in Athens to Jefferson Standard, Jefferson Standard will pay the additional sum of $21,670 to Athens for such stock.

**31.**

The stock of Athens Newspapers, Inc., has unique characteristics and value to Jefferson Standard, and Jefferson Standard will be irreparably harmed if Athens, Morris III and Southeastern are allowed to breach and repudiate the Stock Purchase Option contract with Jefferson Standard.

**32.**

Jefferson Standard will have no adequate remedy at law for such breach if relief is denied under Jefferson Standard's previous counterclaims.

In its prayer for relief, Jefferson requested that the court order Athens specifically to perform its obligations under the purchase option.

 Athens contends that, to obtain relief under this counterclaim, Jefferson should have been required to prove that Athens had "repudiated the obligations of the Stock Purchase Option contract ...." Counterclaim ¶ 29. Athens argues that the district court improperly granted Jefferson relief because filing a declaratory action does not constitute repudiation. We see no need to address the issue of what constitutes repudiation here, however.[4] It is clear under the terms of the agreement that Jefferson could exercise its purchase option as long as Athens had not "purchased" the option or repurchased the shares. *See supra* § II. Thus, the twenty-ninth numbered paragraph of the counterclaim was, in this situation, mere surplusage. It is clear that Jefferson did not need to prove repudiation in order to prevail. Jefferson could merely have requested the court only to enforce the purchase option without reference to Athens' performance or failure to perform the other portions of the agreement. Pleading facts not necessary to state a claim is not grounds for dismissal of a complaint, *Thompson v. Allstate Insurance Co.*, 476 F.2d 746, 749 (5th Cir.1973) and we are familiar with no authority holding that a party must prove a fact unnecessarily pleaded to prevail.[5] Such a rule would contravene the hornbook law that pleadings should be construed to promote justice and not to trap the unwary. *See, e.g.,* Wright, *Law of Federal Courts* § 68 (4th ed. 1983).

## IV. REVIVAL OF THE REACQUISITION OPTION

In its final claim, presented to the district court in the Rule 59(e) motion, Athens argues that we should direct the district court to reinstate Athens' reacquisition option, which expired under the terms of the agreement on December 1, 1979. Athens argues that it was the clear intent of the parties to grant Athens the right, by exercising the reacquisition option, to prevent Jefferson from "permanently" acquiring

---

**4.** In any event, it is clear that Athens is unwilling to perform; whether or not this refusal legally should be characterized as repudiation is irrelevant.

**5.** Jefferson apparently inserted the paragraph alleging repudiation because Athens in its complaint for declaratory judgment alleged that the contract was void and unenforceable.

forty percent of Athens' stock. Athens contends that the district court possesses the inherent equitable power to reinstate the reacquisition option given the circumstances of this case but cites no cases reaching a similar result.[6]

■ We conclude that this is not a case in which the district court abused its discretion when it essentially refused to rewrite the agreement. The agreement evidences no intent that Athens would always have an unqualified right to exercise its reacquisition option: the agreement specifically provides that Athens may exercise that option for a period of only one year after the expiration of the two-year period specified in the second paragraph, while Jefferson's purchase option did not expire until twenty-five years from the date of the agreement. Thus, if anything, the agreement indicates that the parties did not intend Athens in all events to retain the right to exercise its reacquisition option and prevent Jefferson from becoming a "permanent" stockholder.

Athens argues that it would be "inequitable," "contrary to law," and a "forfeiture" should we not reverse the district court on this issue and order reinstatement of its option; however, we do not perceive this to be a case in which truth and justice is so clearly on one side or the other. The concept of the option agreement was first proposed by Billy Morris in an effort to convince Jefferson to loan money to the Publishing Corporation without requiring him to assume personal liability. Deposition of Morris at 31–34. Jefferson did not coerce Morris into signing the agreement—by all indications, it was the product of bargaining between parties well able to protect their own interests.

AFFIRMED.

---

**6.** We note that the reacquisition option is, in practical effect, identical to Jefferson's put option, which Athens has continually asserted to be invalid.